# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

JOSHUA D. KOCHEN,

                Plaintiff,

     vs.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security;

                Defendant.

8:17CV62

MEMORANDUM
AND ORDER

This matter is before the Court on the Motion for an Order Reversing the Commissioner's Decision, ECF No. 11, filed by Plaintiff Joshua D. Kochen, and the Motion to Affirm Commissioner's Decision, ECF No. 12, filed by Defendant Nancy C. Berryhill. For the reasons stated below, the Motion for an Order Reversing the Decision will be denied and the Motion to Affirm the Decision will be granted.

## PROCEDURAL HISTORY

Kochen filed for Title II benefits on February 20, 2014. Tr. 19.[1] His claim was denied initially on April 7, 2014, and again on reconsideration on July 16, 2014. He requested a hearing, which was held on November 2, 2015. The Administrative Law Judge (ALJ) issued a written opinion denying benefits on December 14, 2015.

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to

---

[1] Pinpoint citations to the transcript of the Administrative Record ("Tr.") shall be to the consecutively numbered pages in the record rather than to the Page ID of the docket.

determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Kochen had not engaged in substantial gainful activity since February 6, 2013. Tr. 21.

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities," 20 C.F.R. § 404.1520(a)(4)(ii) & (c), and satisfies the "duration requirement." 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Kochen had the following severe impairments: Degenerative disc disease of the cervical and lumbar spine; small disc bulge; status post lumbar fusion; status post cervical arthroplasty; and obesity. Tr. 21.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis

ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Kochen did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 22.

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC[2]) to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Kochen had the residual functional capacity to perform "sedentary work" as defined by 20 C.F.R. 404.1567(a), "but with additional limitations." Tr. 22. The ALJ found that Kochen could only perform work "that does not require foot controls with the right leg/foot; or greater than frequent crouching, stooping, kneeling, or crawling;" and work "that does not involve concentrated and/or sustained vibration." *Id.* Ultimately, the ALJ concluded that Kochen was unable to perform any past relevant work. Tr. 32.

At step five, the ALJ must determine whether the claimant is able to do any other work considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. The ALJ determined that there are jobs that exist in significant numbers in the national economy that Kochen could perform, and, therefore, Kochen was not disabled from February 6, 2013, to the date of the decision, December 14, 2015. Tr. 32–33.

_____

[2] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

# FACTUAL BACKGROUND[3]

## I. Medical Opinion Evidence

On February 6, 2013, Kochen was seen in an emergency room with increasing left chest wall and thoracic spine pain after an injury at work while driving a large loader. Tr. 336. Xrays of his chest and thoracic spine showed no acute issues. *See* Tr. 346–48. Kochen was discharged with prescriptions for Anaprox, Flexeril and Percocet, and instructed to follow up with an occupational health provider, his primary physician, and "back surgeon." Tr. 337. On February 11, 2013, Kochen saw Dr. David Hoeft, M.D. Tr. 368. Dr. Hoeft's note stated that Kochen's injury resulted from the collapse of the air bladder in the seat of his front-loader, causing him to land hard on the metal underneath. Tr. 368. Kochen had not returned to work since his injury and his pain had not improved. *Id.*

Kochen had low back pain when he sat or stood, but he felt better when lying down. *Id.* An x-ray showed Kochen's prior lumbar fusion was intact, so Dr. Hoeft continued the medications from the emergency room and "reassured him that in the absence of neurological signs or symptoms and a good x-ray, that there was no need to see orthopedic surgery at this time." Tr. 369. On February 18, 2013, Kochen returned to Dr. Hoeft. Tr. 366. He still had low back pain and left-side chest pain, shortness of breath, and pain around his left side to the middle of his back. *Id.* Dr. Hoeft thought Kochen was having "mostly muscle spasms of the chest wall," which "over time should

---

[3] This Court's General Order No. 2015-05 instructs that a plaintiff challenging a final decision of the Commissioner of the Social Security Administration (SSA) shall include in his or her brief supporting a motion to reverse the decision "a statement of material facts," which is "supported by page references to the administrative record." The Commissioner must then file a motion to affirm its decision and include with its supporting brief "a non-repetitive counter-statement," if the Commissioner disagrees with any portion of the plaintiff's statement. Here, the parties have substantially complied, and a synthesis of their competing statements composes this section of the Court's order.

improve," or that Kochen may have had "a thoracic nerve impingement" that might improve with an injection from a pain doctor. Tr. 367. Dr. Hoeft referred Kochen to Dr. James P. Devney for evaluation for thoracic spine injections. *Id.*

On February 25, 2013, Kochen saw Dr. Devney. Tr. 661. Dr. Devney noted Kochen's pain ranged from 7 to 8 out of 10. *Id.* Dr. Devney noted Kochen's injury occurred when his "[a]irbag under seat failed while driving large utility truck over bum[p]s in road. Slammed hard into seat causing instant pain in back." *Id.* Dr. Devney noted that Dr. Phillips had performed back surgeries in 2008 and 2010, to Kochen's lumbar and cervical spine, respectively. Tr. 662. On exam, Kochen was tender over his lower thoracic spine, his L4 and L5, and over his left costochondral junction from ribs 4 through 8. *Id.* Lumbar spine extension of two degrees caused pain. *Id.* The clinical findings revealed Kochen had no gross deformities of his spine and no muscle spasms; he could flex forward 50 degrees without pain; he had 5/5 motor function; and he had normal muscle tone and bulk throughout his lower extremities. Tr. 662–63. He had normal sensation, "2+ and symmetric" reflexes, negative sitting and cross-legged straight leg raises, he ambulated independently with a normal gait pattern, and he had no difficulty tandem walking or heel-and-toe walking. Tr. 663. Dr. Devney recommended two weeks of physical therapy, weaning off Percocet, switching from Flexeril to Tizanidine, and continuing other medications. Tr. 664. Kochen was to remain off work until further notice. Tr. 667.

On March 8, 2013, Kochen saw Dr. Alicia Feldman. Tr. 657. His pain was increasing, with mild low back pain and numbness in his left foot, and physical therapy was not providing any relief. *Id.* Naproxen was upsetting his stomach. *Id.* Percocet,

which he was taking up to five times a day, was "just tak[ing] the edge off" his pain.  *Id.* Kochen moved about the room without hesitation or facial grimace.  Tr. 657.  He could forward flex to 70 degrees with pain, had 5/5 motor function, and had normal muscle tone and bulk throughout his lower extremities.  Tr. 658.  Kochen demonstrated symmetrical reflexes, negative sitting and cross-legged straight leg raises.  *Id.*  He ambulated independently with a normal gait pattern, and he had no difficulty tandem walking or heel-and-toe walking.  *Id.*  Dr. Feldman planned a thoracic MRI to further evaluate Kochen's work injury.  Tr. 658. She also switched Kochen from Naproxen to Celebrex, refilled his Lidoderm and Percocet, and kept him off work pending the results of the planned MRI.  Tr. 659–60.  The subsequent thoracic spine MRI showed a right paracentral disc protrusion at T7-T8, which contacted the ventral aspect of the spinal cord.  Tr. 480.

On March 13, 2013, Kochen returned to Dr. Devney. Tr. 652. Dr. Devney performed a T7-T8 transforaminal epidural injection, and released Kochen "back to sedentary work."  Tr. 654–56.  Dr. Devney "had a lengthy, sit-down conversation" with Kochen and his significant other and pointed out that "several yellow flags are obvious" and there certainly "is some element of symptom magnification."  Tr. 654.

On March 21, 2013, Dr. Devney noted Kochen had failed to respond well to the thoracic spine epidural injection.  Tr. 647.  During the examination, Kochen moved about the room without hesitation or facial grimace, had no muscle spasm or spinal deformities, and ambulated independently with a normal gait pattern.  Tr. 647–48.

Kochen wanted to see Dr. Eric Phillips, the surgeon that had treated his prior low back and neck issues.  Tr. 648.  Dr. Devney's note stated that "[i]n an effort to satisfy

[Kochen's] desire, referral provided." *Id.* Dr. Devney stopped Kochen's pain medication, Percocet, because Dr. Devney believed Kochen's pain complaints were out of sync with the objective findings, and released Kochen from his care. *Id.* Kochen was to continue with the "same work restrictions" until he saw Dr. Phillips. Tr. 650.

On March 28, 2013, Kochen saw Dr. Phillips. Tr. 399. Kochen was having right leg weakness with prolonged standing, in addition to his left leg pain. *Id.* Kochen's thoracic and lumbar spine "exhibited tenderness on palpation." Tr. 401. He had pain with flexion and extension of his lumbosacral spine. Tr. 402. Waddell's sign testing was negative. *Id.* Kochen did not appear uncomfortable, had a normal posture, and had no pain on motion of the thoracic, cervical, and lumbar spines. Tr. 401. Kochen's motor strength was 5/5, and his muscle bulk was normal. Tr. 402. His reflexes were 2+ throughout, and his gait and stance were normal. *Id.* Dr. Phillips planned for another MRI of Kochen's thoracic spine and an MRI of his lumbar spine. Tr. 403. Dr. Phillips prescribed Lyrica and continued Celebrex and Lidoderm patches. Tr. 403–04. Dr. Phillips found Kochen could not return to work. Tr. 406.

On April 8, 2013, Kochen's thoracic spine MRI showed a small right paracentral disk protrusion at T7-8 with mild effacement of the thecal sac. Tr. 481. His lumbar spine MRI showed a small right foraminal disk protrusion at L3-4 with mild right foraminal stenosis at that level. Tr. 482. On April 11, 2013, Dr. Phillips went over the MRI results with Kochen. Tr. 409. Lyrica had helped temporarily, but Kochen seemed to trend back to baseline. *Id.* Most of his pain was in the thoracic region in the midline and came from the lumbosacral area of his lower back and radiated into his right leg to his toes. *Id.* His pain was aggravated by "standing, twisting, [and] sitting in a chair

without a back rest." *Id.* On examination, Kochen had 5/5 motor strength throughout, symmetric reflexes, normal sensation, no spinal tenderness to palpation, and normal gait and stance. Tr. 410. Dr. Phillips ordered "conservative, non-operative care," and noted that Kochen might benefit from further injections and pain management. Tr. 411. Dr. Phillips referred Kochen to Dr. John Massey to try a right-sided T8-9 thoracic epidural. *Id.* Kochen was to remain off work for the next two months. Tr. 413.

On April 11, 2013, Dr. Massey, performed the right T8-9 thoracic transforaminal epidural steroid injection. Tr. 408. On April 25, 2013, Kochen returned to Dr. Massey and reported his symptoms had not improved. Tr. 414. Dr. Massey noted that "[Kochen] is describing that the radiating pain into the thoracic distribution intermittently on the left side and on the right side has been reduced substantially and consistently, but the axial back pain in the midthoracic region is really unchanged." *Id.* This pain was aggravated with sitting and standing for long periods of time or activity. *Id.* Lyrica had been of some benefit "with very little in the way of adverse effects . . . ." *Id.* Dr. Massey described the etiology of Kochen's pain:

> First, the disk at the T7-8 level leads to radiating pain in the thoracic distribution involved and this is what we would expect to improve with the epidural steroid injection under transforaminal approach. The Lyrica is also beneficial for this and it is consistent with what we would expect when he described telescoping of his pain more into the thoracic axial distribution rather than a radicular pattern. Second, however, we also see discogenic pain which is also consistent with what we would expect.

Tr. 417. Dr. Massey also noted that Kochen had not been satisfied with Dr. Devney's care. *Id.* Dr. Massey had a discussion with the case manager for the workers' compensation insurance carrier "to ensure everyone is on the same wavelength." *Id.* Dr. Massey continued the restrictions set by Dr. Phillips. *Id.*

On May 9, 2013, Kochen began physical therapy. Tr. 419. He was seen for physical therapy several times before his discharge from physical therapy on June 17, 2013. Tr. 424, 427, 434, 438, 441, 444, 450, & 452.

On May 23, 2013, Kochen returned to Dr. Massey. Tr. 557. Kochen reported improvement with his initial efforts at physical therapy and Lyrica. *Id.* His pain was still worse with activity. *Id.* Dr. Massey noted Kochen appeared to reach the maximum level of improvement with conservative measures. Tr. 559–60. Dr. Massey increased Kochen's Lyrica, continued his physical therapy, and continued Dr. Phillips's work restrictions. *See* Tr. 437 & 560.

On June 6, 2013, Kochen returned to Dr. Phillips. Tr. 446. His pain had increased over the prior two days—he had been trying to perform his home exercises "when he stepped [off of] the stairs 'wrong' twisting his back." *Id.* Intermittent right leg pain radiated down his leg to his foot. *Id.* Dr. Phillips noted Kochen did not appear uncomfortable, and he had normal posture, sensation, muscle bulk and muscle tone. Tr. 447–48. Kochen had symmetrical reflexes, no muscle spasm or atrophy, and no pain on motion of the thoracic, cervical, and lumbar spines. *Id.* He had a normal gait and stance. *Id.* Dr. Phillips found that Kochen could not return to work. Tr. 451.

On June 14, 2013, a MRI of Kochen's thoracic spine was performed. Tr. 484. Like the prior thoracic spine MRIs, this MRI showed a small right paracentral protrusion of the T7-8 disk that effaced the thecal sac. *Id.* On June 24, 2013, Kochen returned to Dr. Phillips to review the results of the June 14 MRI. Tr. 454. Dr. Phillips noted that Kochen's thoracic pain continued, kept him up at night, and was aggravated by quick changes of movement or direction. *Id.* The pain would "cause [Kochen's] right leg to go

out on him." *Id.* Kochen had been falling as a result. *Id.* Dr. Phillips noted the Kochen was "very discouraged by how much general daily activities and trivial movement causes onset of his pain," *id.*, and that the disc protrusion had increased "by approximately ½ millimeter" in the recent MRI. Tr. 455. Dr. Phillips explained that the classic surgery repair would involve going through Kochen's chest by removing a rib, removing the disc herniation, and then performing a fusion. Tr. 456. Kochen wanted to know if the procedure could be performed with a posterior approach, which Dr. Phillips considered a reasonable question he would discuss at a case conference. *Id.* Dr. Phillips again found that Kochen could not work. Tr. 458.

On July 1, 2013, Dr. Phillips held the conference to discuss Kochen's potential back surgery. Tr. 535. Dr. Phillips's note from the conference stated "[i]t was felt that [Kochen] undergo his third injection and trial traction" and that "[Kochen] should undergo a CT scan" to see if the herniated disc at T7-8 was calcified. *Id.* If the disc was calcified, further nonoperative care was planned, and if not calcified, a fusion could be considered. *Id.*

On July 11, 2013, Dr. Massey performed another thoracic transforaminal epidural steroid injection on the right at the T8-9 level. Tr. 461. On July 25, 2013, the CT scan was performed. Tr. 485. On July 29, 2013, Erin Strufing, PA-C, relayed to Kochen that the CT scan had showed "the disc herniation is not calcified and is in fact a soft disc herniation." Tr. 462. Kochen told Strufing he could not find a provider to perform traction therapy and that the thoracic epidural injection had not provided relief. *Id.*

Dr. Gammel completed a RFC evaluation on July 29, 2013. Tr. 628–29. Dr. Gammel opined Kochen could sit one hour at a time and a total of 8 hours in an 8-hour

workday; stand and walk for ½ hour each and a total of 2 hours each in an 8-hour workday; lift and carry up to 10 pounds frequently, and up to 20 pounds occasionally; push and pull up to 35 pounds occasionally; and could use both his hands for repetitive grasping, manipulation, and using arm controls, and his right foot but not left foot for leg controls.  Tr. 628.  Dr. Gammel also opined that Kochen could not climb ladders, but could frequently drive, reach out and above shoulder level, occasionally climb stairs, and seldom "bend/stoop," "squat/crouch," crawl, and kneel.  Tr. 629.

Dr. Phillips's objective medical findings during Kochen's August 7, 2013 examination demonstrated that Kochen did not appear uncomfortable, had no muscle atrophy, and had normal muscle bulk and tone, gait and stance, sensation, and reflexes.  Tr. 464.  Dr. Phillips told Kochen to perform aerobic conditioning and exercise. Tr. 465.  Dr. Phillips noted "sedentary duty certainly could be done" but none was available with his employer.  *Id.*

On October 7, 2013, Kochen returned to Dr. Phillips.  Tr. 467.  Dr. Phillips noted Kochen again declined surgery.  Tr. 469.  Dr. Phillips placed Kochen at maximum medical improvement, and sent him for a functional capacity evaluation (FCE) to determine his permanent work restrictions.  *Id.*  Until the permanent restrictions were obtained after the FCE, Kochen was not to return to work.  Tr. 475.

A physical therapist performed an FCE on November 25, 2013  (November 2013 FCE).  Tr. 486.  The FCE stated that Kochen "was able to complete the following tasks at the 'Occasional' Level: Sitting, Standing, Walking, Forward Reaching, Bending, Squatting and Kneeling," Tr. 488, and that Kochen was able to complete "Stair Climbing and Crawling" at the "'Infrequent' Level."  *Id.*  The FCE concluded that "the results

indicate [Kochen] is able to work at the SEDENTARY Physical Demand Level for an 8 hour day according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991," Tr. 486 and listed Kochen's "WORK CLASSIFICATION" as "SEDENTARY." Tr. 489. The FCE further noted:

> [Kochen] exhibited symptom/disability exaggeration behavior by our criteria . . . . He passed 25/30 validity criteria during the FCE, 83%, which suggests good effort and valid results which can be used for medical and vocational planning. Therefore, the symptom/disability exaggeration classification did not affect the FCE results and may have been due to normal personality traits, anxiety regarding reinjury, a misunderstanding of the self report pain scales and other similar factors.

Tr. 488.

When Kochen returned to Dr. Phillips on December 12, 2013, he did not appear uncomfortable. Tr. 477. There was no muscle spasm or muscle atrophy. *Id.* Kochen had some decreased tactile sensation, but his motor strength was 4 to 5 out of 5, muscle bulk and tone were normal, and reflexes were symmetrical. Tr. 477. Dr. Phillips opined the that November 2013 FCE "demonstrates [Kochen's] ability to participate in sedentary work," Tr. 478, and he stated Kochen could "return to work with restrictions [p]er valid FCE results," Tr. 479.

On February 21, 2014, Kochen applied for disability benefits. Tr. 172. He explained in his initial disability report he was disabled due to thoracic herniation, status post cervical fusion, radicular pain, and status post lumbar disc surgery. Tr. 235.

When Kochen saw Dr. Phillips on May 1, 2014, Dr. Phillips reported Kochen's back situation was stable and he could continue to work with the same restrictions. Tr. 497. Dr. Phillips instructed Kochen to try swimming for exercise. *Id.*

On March 10, 2014, Kochen returned to Dr. Hoeft. Tr. 500. Dr. Hoeft's notes stated that Kochen "sits in a hot bath for a couple hours at night which does help" and that "[Kochen] would like to see if he could get a hydrotherapy unit to use at home." *Id.* Kochen wanted Dr. Hoeft to provide a note to support Kochen's request for a handicap permit for his car, and wanted a letter that would allow his life insurance premiums to be waived due to disability. *Id.* Kochen's medications at the time were Lyrica, Celebrex, Lidoderm patches, and an occasional Percocet. *Id.* Dr. Hoeft provided the requested note and letter. *Id.*

On April 4, 2014, Jerry Reed, M.D., completed a RFC evaluation, wherein he opined the evidence in the record demonstrated Kochen could lift up to 10 pounds, stand and/or walk a total of two hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. Tr. 83 & 86. Dr. Reed set forth the evidence supporting his opinion, including Dr. Phillips's objective findings and opinion that Kochen could perform sedentary work with normal breaks. Tr. 81.

On May 1, 2014, Kochen returned to Dr. Phillips. Tr. 495. He had ongoing pain between his shoulder blades, and in his low back and right leg. *Id.* Dr. Phillips noted Kochen's weight was increasing. Tr. 497. Kochen had "some add on deterioration above his lumbar fusion," which was not work-related. Tr. 497. Dr. Phillips maintained the permanent restrictions. *See id.*

On May 2, 2014, Kochen was in a car accident where he was "hit by a minivan at high rate of velocity totaling his car." *Id.* Kochen complained of pain at 8 out of 10. *Id.* On May 6, 2014, Kochen saw Dr. Jeffrey Rapp, Jr., for a follow-up after a recent

hospitalization at UNMC.  Tr. 501.  He was prescribed Percocet and diagnosed with chest wall pain and contusion of the left ribs.  Tr. 502.

Dr. Steven Higgins completed a RFC evaluation on July 9, 2014, wherein he stated "the new evidence is consistent with the initial RFC."  Tr. 92.  Dr. Higgins noted the new evidence demonstrated Kochen's condition was stable and no further interventions were planned, and the evidence indicated Kochen could perform sedentary work, but was limited from more strenuous work.  Tr. 92–94.

On October 4, 2014, Kochen returned to Dr. Hoeft for medication refills.  Tr. 507.  Dr. Hoeft noted that, besides his issues with sitting, standing and walking, "[Kochen's] only relief is when he spends several hours in the bathtub."  *Id.*  Kochen felt his pain was not any better and had perhaps worsened.  *Id.*  Dr. Hoeft noted that "[t]his young gentleman has 2 areas of pain that do not appear to be anatomically connected."  Tr. 508.  Dr. Hoeft referred Kochen to Dr. Soares at a pain clinic and continued Kochen's medications, including Percocet.  *Id.*  On March 23, 2015, Kochen returned to Dr. Hoeft.  Tr. 603.  Kochen had gained about 10 pounds since his last appointment with Dr. Hoeft, and his body mass index was up to 33.72.  *Id.*  Dr. Hoeft completed another statement for Kochen's life insurance premiums, refilled his Percocet, and started Kochen on a weight loss drug.  *Id.*

Kochen filed a claim for workers compensation benefits, and on January 7, 2015, the Workers Compensation Court awarded Kochen ongoing weekly benefits of $638.83—or $33,219.16 per year—because Kochen could not perform his past medium exertional work.  Tr. 298.

On June 1, 2015, Kochen returned to Dr. Phillips. Tr. 510. Dr. Phillips noted Kochen had decreased sensation in his right leg in various dermatomes. Tr. 512. Dr. Phillips opined that Kochen had "been rendered totally disabled." Tr. 513. Dr. Phillips's diagnoses were herniated thoracic disc and history of lumbar arthrodesis. *Id.* Dr. Phillips's objective findings demonstrated Kochen did not have muscle spasm, spinal tenderness to palpation, or step deformity. Tr. 512. Kochen had normal lumbar flexion, extension, and rotation, and his straight leg raises were negative. *Id.* Kochen had some decreased tactile sensation, but he had full 5/5 motor strength throughout, normal muscle bulk and tone, normal heel and toe walking, symmetrical reflexes, no limp when walking, and no muscle atrophy. Tr. 512–13. Dr. Phillips noted Kochen could return in one year unless his symptoms worsened. Tr. 513.

Kochen's earnings records indicate that other than 2012, he earned $17,000 to $24,000 yearly after 2007. Tr. 185. His monthly family primary insurance amount of disability insurance benefits is $1,398.50, or $16,782.00 per year. *Id.*

## II. Hearing Evidence

The ALJ held the administrative hearing on November 2, 2015. Tr. 39. At the hearing, Kochen described the treatment for his work injury. Tr. 52. He had "several rounds of shots in my back," which generally caused more pain. Tr. 53. Dr. Phillips wanted to perform surgery on Kochen's spine that would require removing a rib, collapsing a lung, and moving Kochen's heart. *Id.* Kochen said he declined the procedure, as it was not guaranteed to cause improvement, would cause a long recovery, and could have made his pain worse. Tr. 53–54. Once Kochen declined the

procedure, he was placed at maximum medical improvement and sent for a FCE.  *See* Tr. 54.

Kochen stated that he previously had issues with his lumbar and cervical spine, but was able to return to work.  Tr. 55.  Kochen described pain that came around his chest and felt "like somebody [was] standing on [his] chest."  Tr. 56.  Kochen testified that he had leg pain in his right leg that radiated from his low back to his toes and made it painful to walk.  *Id.*  His pain medications caused him trouble sleeping, sometimes affected his ability to concentrate, and sometimes made him drowsy.  Tr. 57.  The pain sometimes kept him up at night.  Tr. 58.

Kochen described how his pain had required him to use his left foot at times while driving, and made it difficult to use stairs, bend over, or sit down at times.  *Id.*  He could stand for 20 to 30 minutes before needing to sit or lie down.  Tr. 59.  He could sit for up to two hours, if provided the right chair, before needing to stand or lie down.  *Id.* Kochen later clarified that he could sit for two hours at a time in a recliner, and in a "business-type chair" he could only sit for 20 to 30 minutes at a time.  Tr. 60.  To make his back feel better, he put his hands behind his back and pressed on his thoracic spine. *See* Tr. 59.  His pain affected his attention and concentration.  Tr. 60.

During his workers' compensation claim process, Kochen received vocational testing that revealed he needed "remedial training just to get remedial courses."  Tr. 60–61.

During the hearing, Kochen was unable to continue sitting during his testimony. *See* Tr. 62.  Kochen explained he needed to "lean on [a] wall for a minute."  *Id.*  Once he sat back down, Kochen further explained the assistive devices he used in the

bathroom.  *See* Tr. 61–62.  Kochen's counsel closed his questioning by asking Kochen why he thought he could not work eight hours a day.  Tr. 63.  Kochen replied  "I'm in constant pain. I hurt all the time. I mean it's never a pain-free day."  Tr. 63.

The ALJ asked Kochen to explain how he spent the day before the hearing.  Tr. 63.  Kochen stated he spent most of the day in the tub, and on many days sat in a tub for two to three hours.  Tr. 63.  When the weather changed, his pain was "10 times worse than it is on a normal day."  Tr. 63–64.  He otherwise spent a lot of the day lying on the bed or couch.  Tr. 64.  His wife cooked all their meals.  *Id.*  He did not go out much, but had gone with his wife to buy a pair of shoes for one of his children.  Tr. 65.

The ALJ asked Kochen if he could, if dropped off at "the front door of the biggest Wal-Mart store you've ever been in," walk to the far back corner of the store, pick up pencils, and then bring them back to the front of the store.  Tr. 65.  Kochen explained he could not walk that far, but might walk to the pencils, take a break, and then walk back to the front, and then sit down again.  Tr. 65–66.

The ALJ then asked Kochen to explain why he could not do a job where he took customer questions over the phone and answered those questions based on information from a computer, such as the location of the nearest Home Depot based on a caller' zip code.  Tr. 67.  Kochen replied he could not do that due to his sitting and standing difficulties, and his need to "lay down flat" and use a bathtub.  *Id.*  Without being able to lie down or use a bathtub, Kochen thought he could "get through an hour" on a good day.  *Id.*

The ALJ's first hypothetical question to the vocational expert assumed an individual limited to sedentary work with no crouching or stooping; no more than

frequent kneeling or crawling; no operating foot controls with the right leg; no work with concentrated and sustained vibration, such as work with large power tools; and no exposure to hazards, such as unprotected heights or work near dangerous or unguarded moving machinery. Tr. 71. The vocational expert identified unskilled sedentary jobs that could be performed by the hypothetical individual as: "Charge account clerk;" "order clerk, food and beverage;" and "document preparer." Tr. 72. The functional limitations in this hypothetical question became the ALJ's RFC determination. *See* Tr. 22.

The ALJ's second hypothetical included the limitations of the first and added a limitation that "the worker is not able to complete two hour blocks of time on the job either by sitting or standing in combination." Tr. 72. The ALJ stated "[l]et's [s]ay a worker can only work one hour without having to take a break to leave the workstation and lie down for 15 minutes." Tr. 72. The vocational expert testified there would be no full time work for the hypothetical individual. Tr. 73.

Kochen's counsel's first hypothetical assumed an individual limited to lifting 10 pounds occasionally; occasional bending, squatting, kneeling, sitting, standing, walking, forward and overhead-reaching; infrequent stair-climbing and crawling; and no ladder-climbing. Tr. 73–74. Counsel referenced that he was basing his limitations on those described in the November 2013 FCE, which was marked in the record as page 10 of Exhibit 9-F. Tr. 74. The vocational expert stated that the hypothetical claimant could not work in the national economy because "[t]he durations of times that he can sit/stand would prohibit continuity of functioning of a job, any job." *Id.*

Kochen's counsel's second hypothetical assumed an individual limited to lifting no more than 10 pounds and who needed to change positions "at least every 30 minutes throughout the day." *Id.* The vocational expert testified that such limitations would preclude all work in the national economy. Tr. 75.

## STANDARD OF REVIEW

"When considering whether the ALJ properly denied social security benefits, [the Court] determine[s] whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal quotation marks omitted) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the Court's "review extends beyond examining the record to find substantial evidence in support of the ALJ's decision." *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) (internal quotation marks omitted) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)). The Court must "also consider evidence in the record that fairly detracts from that decision." *Id.* (internal quotation marks omitted) (quoting *Cox*, 495 F.3d at 617).

The Court also must determine whether the Commissioner's decision "is based on legal error." *Collins*, 648 F.3d at 871 (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th

Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (internal citations omitted) (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating that allegations of legal error are reviewed de novo).

**DISCUSSION**

Kochen argues that the ALJ decision should be reversed because the ALJ misread the restrictions contained in the November 2013 FCE. Although the November 2013 FCE contains an inconsistent use of terminology, *i.e.*, suggesting that Kochen could sit only at the "occasional" level yet was capable of sedentary work, the ALJ's decision was based on the entire record and is supported by substantial evidence therein.

The November 2013 FCE stated that Kochen was able to sit, stand, walk, and forward-reach at the "'Occasional' Level," and that he could climb stairs and crawl at the "'Infrequent' Level." Tr. 488.

In discussing the November 2013 FCE in his decision, the ALJ stated:

In consideration of the opinion evidence, the [ALJ] affords great weight to the FCE from November 2013. . . . The study was found to be statistically valid; it was conducted as of the time of the claimant's maximum medical improvement; no later evidence serves to rebut it; and it is consistent with the preponderance of the evidence. Additional weight is lent the sedentary FCE, given the fact that it is further supported by Dr. Phillips and, to a certain extent, Dr. Devney—both specialists in the areas of impairment from which the claimant suffers and who each treated the claimant. Not only did Dr. Phillips agree with the FCE specifically in December 2013 but even prior . . . he wrote that the claimant would have "certainly" been capable of sedentary work in August 2013. Dr. Devney initially limited the claimant to sedentary work in March 2013 and, at the

time of discharge later that month, stated that he would be able to do light work. In sum, these opinions are found to be of the greatest probative value when considering the sources and their relative expertise and experience treating and/or examining the claimant directly.

Tr. 31 (internal citations omitted).

The ALJ ultimately concluded that Kochen was able to perform sedentary work. This type of work is defined at 20 C.F.R. § 404.1567(a) as requiring "walking and standing . . . occasionally." Social Security Ruling 83-10 states that "'[o]ccasionally' means occurring from very little up to one-third of the time" and that "[s]ince being on one's feet is required 'occasionally' at the sedentary level . . . periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. SSR 83-10, 1983 WL 31251 (Jan. 1, 1983).

Kochen notes that, although the November 2013 FCE designated Kochen's "Work Classification" as "Sedentary," Tr. 489, it also concluded that, among other limitations, Kochen was limited to "occasional" sitting, *id.* Under SSR 83-10's definition of "occasional," this would mean no more than two hours of sitting per day. According to Kochen, this created an error in the ALJ's decision.

Kochen argues that this case is similar to *Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007), in which an ALJ assigned great weight to a treating physician's opinion that adopted "restrictions detailed in the [FCE], which are for sedentary work." *Id.* at 770. The court of appeals held that the particular restrictions, not the designation of sedentary work, was paramount. *See Id.* (citing SSR 96–5p (July 2, 1996), 1996 WL 374183, at *5) ("Whether a claimant can work sedentary work is a question for a vocational expert, not a medical source."). Because the FCE's restrictions were not in

the record, the court held the district court should have directed the SSA to locate the FCE.  *Id.* at 771.

Kochen notes that the relevant FCE here shows that the precise restrictions demonstrate Kochen is unable to do sedentary work, regardless of the FCE's categorization of Kochen's work level as sedentary.  Kochen also argues that Dr. Phillips released him from his December 2013 appointment to return to work per the restrictions in the November 2013 FCE, thus adopting those restrictions himself. Finally, Kochen argues that his counsel's hypothetical question to the vocational expert at the hearing reflected the limitations of the November 2013 FCE and the vocational expert stated that such limitations precluded work in the national economy.  ECF No. 11-1, Page ID 747 (citing Tr. 73–74, 615); *id.*, Page ID 757 (citing Tr. 31, 277–78, 488–89, 615).

Although Kochen essentially argues that the ALJ's RCF, and resulting determination of Kochen's non-disability, were erroneous due to a misreading of the November 2013 FCE, "[i]t is 'the ALJ's responsibility to determine [claimant's] RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (second and third alterations in original) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir.1995)).  The ALJ's RFC was based on the totality of consistent and substantial evidence throughout the entire record.

As Kochen correctly notes, the Eighth Circuit has held that whether a claimant can perform sedentary work "is a question for a vocational expert, not a medical

source." *Coleman*, 498 F.3d at 770. This holding cites Social Security Ruling 96–5p, which states "[a]djudicators must not assume that a medical source using terms such as "sedentary" and "light" is aware of our definitions of these terms" and that "[t]he judgment regarding the extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment . . . and is a finding that may be dispositive of the issue of disability." 1996 WL 374183, at *5. The Court notes that the November 2013 FCE, stating that Kochen was capable of sedentary work, cited to the definition of "sedentary" in the "Dictionary of Occupational Titles, U.S. Department of Labor, 1991." Tr. 486. There is no indication that the ALJ blindly accepted the FCE's use of the term "sedentary" as dispositive of the overall issue. In discussing Kochen's worker's compensation judgment, which stated that Kochen was "totally disabled," the ALJ noted that "terms of art" appearing in the record are not controlling for determining disability benefits. Tr. 24. Dr. Phillips, although noting several times that Kochen was capable of sedentary work, also noted at one point that Kochen was "totally disabled," Tr. 513. The ALJ did not appear to treat either label as controlling, but rather relied on objective findings in determining the RFC.

Dr. Phillips found that Kochen could perform sedentary work in August of 2013, Tr. 26 & 465, November 2013, Tr. 27 & 478, and May 2014, Tr. 497. The notes from various examinations by Dr. Phillips recorded that Kochen did not appear uncomfortable, had negative straight leg raising, no spinal tenderness, full muscle strength, tone and bulk with no evidence of muscle atrophy or muscle spasm, and had normal gait, stance, balance, and coordination. Tr. 26, 27, 401–02, 410, 432, 447, 455, 464, 468, 477, 512–13.

The ALJ noted that these objective findings were consistent with those of Dr. Devney. Tr. 27. In examinations in February and March of 2013, Dr. Devney recorded that Kochen had normal muscle tone and bulk throughout his lower extremities, negative sitting and cross-legged straight leg raises, 5/5 motor function, an independent and normal gait pattern, no gross deformities of his spine, no muscle spasms, no difficulty tandem walking or heel and toe walking, and that he moved about the room without hesitation or grimace. Tr. 27, 647–48, 652–53, 657–58, 662–63. On March 21, 2013, Dr. Devney released Kochen from his care with a "light duty" work restriction. Tr. 648.

The ALJ expounded on Dr. Devney's findings that Kochen "continue[d] to demonstrate unreasonable pain behaviors in light of no significant objective correlate," and that "for certain there is some element of symptom magnification." Tr. 28 (first quoting Tr. 654, then Tr. 648). The ALJ concluded "Dr. Devney's statements [of symptom magnification by Kochen] appear to have foreshadowed later repeated instances of potential malingering . . . and there are independent inconsistencies that suggest symptom magnification without direct notation." Tr. 28.

The ALJ noted that the November 2013 FCE said Kochen exhibited "disability exaggeration behavior," *id.* (quoting Tr. 488), and muscle strength that was "inconsistent anatomically," *id.* The ALJ found that "no such signs [of disability exaggeration] were demonstrated during visits to Dr. Phillips on either October 7 or December 12, 2013, where [Kochen's] presentation—including lumbar flexion, gait and balance—was largely unremarkable. *Id.*

These opinions were also consistent with the Disability Determination Services Doctor Opinions, Tr. 78–98, as noted by the ALJ, Tr. 31. In his opinion, issued on April 4, 2014, Dr. Jerry Reed opined that the evidence, which included Dr. Phillips's objective findings, demonstrated Kochen could lift up to ten pounds, stand and/or walk a total of two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Tr. 78–86. On July 9, 2014, Dr. Steven Higgins, noted that the new evidence in the record was not significantly different from the evidence available to Dr. Reed, and that it demonstrated Kochen's condition was stable and he could perform sedentary work. Tr. 88–96.

**CONCLUSION**

For the reasons stated above, the Motion for an Order Reversing the Commissioner's Decision, ECF No. 11, will be denied, and the Motion to Affirm Commissioner's Decision, ECF No. 12, will be granted. Accordingly,

IT IS ORDERED:

1. The Motion for an Order Reversing the Commissioner's Decision, ECF No. 11, filed by Plaintiff Joshua D. Kochen, is denied; and

2. The Motion and the Motion to Affirm Commissioner's Decision, ECF No. 12, filed by Defendant Nancy C. Berryhill, is granted;

3. The Commissioner's decision is affirmed;

4. The appeal is denied; and

5. A separate judgment will be entered.

Dated this 22nd day of November, 2017.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge